ENGLISH et al. v. SPOKANE COM. CO.

(Circuit Court of Appeals, Ninth Circuit. July 24, 1893.)

No. 82.

**1. SALE—WARRANTY—EVIDENCE.**

Defendant, in Spokane Falls, telegraphed plaintiffs in Omaha: "Wire price car strictly fresh eggs, new cases." Plaintiffs replied: "Car fresh eggs, 16. Track here for immediate acceptance." Defendant answered: "If eggs strictly fresh, 14 cents. Answer if accepted." Plaintiffs replied: "Offer eggs accepted." *Held*, that plaintiffs warranted the eggs to be strictly fresh at Omaha, and was not liable for deterioration naturally resulting during transportation.

**2. SAME.**

Defendant, in Spokane Falls, telegraphed plaintiffs, in Omaha, inquiring the price of five car loads of "good potatoes," and, after some disagreement as to price, the sale was made, and the potatoes shipped to defendant. *Held*, that plaintiffs gave an implied warranty that the potatoes were of good, merchantable quality when shipped.

**3. SAME—WAIVER OF WARRANTY.**

Plaintiffs shipped potatoes from Omaha to defendant at Spokane, with an implied warranty of their quality when shipped. When they arrived, defendant, at its own request, was allowed to inspect them before acceptance. *Held*, that the inspection was not a waiver of the warranty.

**4. SAME—REMEDY OF BUYER UNDER WARRANTY.**

Defendant, on finding the potatoes damaged, could return them, and rely on the warranty, or keep them, and dispose of them in good faith, and hold plaintiffs responsible for his damages; but it was his duty to notify plaintiffs promptly of the defect.

**5. DAMAGES—MEASURE OF—PROFITS.**

In such a case the profits defendant would have made on a resale are not recoverable as damages.

In Error to the Circuit Court of the United States for the Eastern Division of the District of Washington.

At Law. Action by Paul A. English and Arthur F. English, copartners, against the Spokane Commission Company, for payments alleged to be due upon a contract of sale. Defendant alleged a breach of warranty, and set up a counterclaim. Judgment was

given for plaintiffs, but a motion for a new trial was granted, (48 Fed. Rep. 196,) and judgment thereafter given for defendant. Plaintiffs bring error. Reversed.

Aylett R. Cotton, (H. C. Brome, on the brief,) for plaintiffs in error.

George Turner, (Turner, Graves & McKinstry, on the brief,) for defendant in error.

Before McKENNA and GILBERT, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. The plaintiffs in error brought this action to recover of and from the defendant in error the sum of (1) $2,180.20 for goods, wares, and merchandise sold and delivered to defendant, consisting of potatoes and cheese; (2) $121.49 expenses incurred in preparing the cars in which the potatoes and cheese were shipped; (3) $6.80 advanced for defendant; making a total of $2,308.49.

The defendant admits the correctness of these amounts, and pleads as a counterclaim thereto (1) damages in the sum of $995.25 for breach of contract in delivering a car load of strictly fresh eggs at the price of 14 cents per dozen; (2) damages for breach of contract in delivering potatoes, in the sum of $2,325.41; and prayed judgment for $3,300.66.

A jury trial resulted in a verdict in favor of the defendant for the sum of $992.17.

The plaintiffs are commission merchants, residing at Omaha, Neb. The defendant is a corporation engaged in business as a produce and commission merchant at Spokane Falls, Wash.

The contracts between the parties in relation to the eggs and potatoes, which are the only articles in dispute, were made by telegrams, as follows, viz.: On January 24, 1890, the defendant sent a telegram from Spokane Falls to the plaintiffs at Omaha: "Wire price on five cars good potatoes in burlap sacks. Car strictly fresh eggs, new cases." On January 25, 1890, plaintiffs sent a reply telegram: "Five cars good potatoes, burlap sacks, twenty-eight. Car fresh eggs, new cases, sixteen. Track here for immediate acceptance. Answer." On January 30, 1890, the defendant answered: "If eggs strictly fresh, fourteen cents; potatoes twenty-five cents. Answer if accepted." January 31, 1890, plaintiffs answered: "Offer eggs accepted. Will ship same route. Will consider offer potatoes." The price of potatoes was subsequently agreed upon. The car load of eggs was consigned to the plaintiffs at Spokane Falls, the shipping bill reading: "English Bros. Notify Spokane Com Co.;" and the eggs were paid for upon delivery. When the potatoes arrived at Spokane Falls the defendant telegraphed plaintiffs: "Wire bank Spokane to deliver us bills of lading. Must inspect potatoes before paying drafts." The bills of lading, in pursuance with this request, were delivered by plaintiffs' order to the defendant, and the potatoes were

inspected by the defendant when taken off the cars at Spokane. The testimony upon the part of the plaintiffs tended to show that the eggs were strictly fresh, and the potatoes sound and good, when placed in the cars at Omaha, and that the eggs were liable to. be injured while being transported on the railroad. The testimony offered upon the part of the defendant tended to show that the eggs were rotten and unmerchantable when delivered at Spokane, and that the potatoes were of poor quality when shipped, were poorly packed and were frozen and unmerchantable when they arrived at Spokane.

The assignments of error, which are quite numerous, relate principally to alleged errors of the court in instructing the jury in relation to the warranty of the goods by plaintiffs, and the rule as to the measure of damages. The instructions in relation to the warranty were to the effect that there was an express warranty upon the part of the plaintiffs that the eggs should be strictly fresh at the place of delivery, to wit, at Spokane Falls, and that there was an implied warranty that the potatoes should be of good, merchantable quality, delivered at Spokane. Upon the question of damages the court instructed the jury (1) as to the eggs, that, "if there was any such negligence in the selection of the eggs to be shipped as amounted to a breach of warranty, so that the per cent. loss was greater than ought to have been if due care had been exercised in shipping the goods, then the plaintiffs are liable to the defendant for the price which they received for the eggs, and, in addition to that, for the expenses that were incurred by the defendant in re-sorting and candling them, and separating the good from the bad, and whatever expense they incurred in the way of hauling to and from their customers, and the loss of profit which they would have made on the eggs if they had been good and according to the contract;" and (2) as to the potatoes: "You will include in whatever damages you may allow the defendant for the potatoes the full contract price, the amount of the freight or expenses incurred by the defendant in hauling, assorting, separating them, and any other expenses incurred in connection with the potatoes by reason of the bad condition of them. Add a loss of profits which they could have made by a resale of the potatoes if they had been good."

1. What was the contract in relation to the eggs? We are of opinion that the warranty expressed in the telegrams related to the condition of the eggs placed on board the cars at Omaha. The plaintiffs would not be liable for any deterioration of quality rendering them unmerchantable at Spokane, where they were delivered to the defendant. if such deterioration resulted necessarily from the transit. Bull v. Robinson, 10 Exch. 342; Mann v. Everston, 32 Ind. 356; Leggat v. Brewing Co., 60 Ill. 158; 2 Schouler, Pers. Prop. § 355; 2 Benj. Sales, (8th Ed.) § 944, note 15; Id. § 991. It was therefore erroneous to instruct the jury that plaintiffs "were obliged by the terms of their contract that the eggs should be strictly fresh at the place of delivery." The telegrams referred

to the price at Omaha by the car load. The eggs were to be strictly fresh. Defendant first asked the price of "car strictly fresh eggs, new cases," wishing, of course, to know at what price the plaintiffs were willing to sell a car load of strictly fresh eggs at Omaha. The answer to this inquiry gave the price at 16 cents per dozen. Then came the offer from the defendant that if the eggs were strictly fresh it would give 14 cents. This offer was accepted. The only controversy was as to the price. The words, "track here for immediate acceptance," found in one of the telegrams, may be considered somewhat obscure and indefinite. They were perhaps intended to imply that the plaintiffs had the goods then on hand in cars on the track at Omaha, for immediate acceptance; but, be that as it may, the words have no special significance as to the meaning of the contract between the parties. It is perfectly clear that the warranty, as expressed by the plaintiffs and as understood by defendant, had reference to the condition of the eggs in the car at Omaha. In the very nature of things, this must have been the intention and understanding of both parties. Eggs transported by rail, however fresh when placed upon the cars, are liable to deteriorate to some extent upon the journey. The plaintiffs contracted to ship a car load of "strictly fresh eggs" from Omaha, the eggs to be properly packed in new cases, and placed in the car so to be safely transported to the defendant at Spokane; and for any breach in this respect, if there was any, they would be liable in damages. They cannot be held liable for any loss in the quality of the eggs except such as arose by a breach of their contract. They are not liable for the ordinary and necessary shrinkage in quality incident to the handling of the eggs, and the deterioration which would naturally occur in their transportation to the place of delivery.

In Bull v. Robinson, supra, the court said:

"A manufacturer who contracts to deliver a manufactured article at a distant place must, indeed, stand the risk of any extraordinary or unusual deterioration; but we think that the vendee is bound to accept the article if only deteriorated to the extent that it is necessarily subject to in its course of transit from the one place to the other; or, in other words, that he is subject to and must bear the risk of the deterioration necessarily consequent upon the transmission."

In Mann v. Everston, supra, which was an action for breach of warranty in the sale of a quantity of kiln-dried corn meal, for shipment from Indiana to New Orleans, the court sustained an instruction given to the jury, that, if the meal was sold for shipment to a southern market, a warranty would be implied that it was properly packed and fit for such shipment, and such as was contemplated by the purchase, but not that it would continue sound for any particular or definite length of time.

2. We are of opinion that there was an implied warranty that the potatoes should be of good, merchantable quality when shipped from Omaha. Benj. Sales, (Sth Ed.) §§ 988, 989, 993; Schouler, Pers. Prop. § 354 et seq.; Bridge Co. v. Hamilton, 110 U. S. 114, 3

Sup. Ct. Rep. 537, and authorities there cited; Pease v. Sabin, 38 Vt. 432. The court properly instructed the jury that:

"The circumstances under which the contract was made placed upon the plaintiffs the obligation to use due care in the selection of merchantable potatoes, and to ship to defendant only sound, merchantable articles. There was no express warranty that the potatoes were of any particular quality, but the manner in which the contract was made placed the obligation upon the plaintiffs to ship only such potatoes as were sound, and fit for sale, and not frozen. The potatoes being shipped and tendered to the defendant at Spokane Falls, or at Walla Walla, which is about the same thing, under the circumstances of this case, will be considered as a tender on the part of the plaintiffs of performance on their part of the contract; and that tender, made under the circumstances shown, entitled the defendant, in case the potatoes were not really good, to an option either to reject the tender entirely, and rescind the contract, or the right to take the potatoes, and make the best they could out of them, by sorting them, the good from the bad, and accept the part that were good and claim damages for the loss sustained for the breach of the contract as to those that were bad. In accepting or receiving the potatoes, after learning that part of them were frozen or unfit for sale, if they were, the defendant was obliged to act fairly with the plaintiffs, to have the goods sorted with the least amount of expense for which it could reasonably be done, have them fairly sorted, and allow the plaintiffs credit for all that were good. They were also obligated to act fairly in the matter of notifying the plaintiffs promptly of the condition in which they found them. And in this connection there is a dispute between the parties as to whether the potatoes were bad or not. The conduct of the defendant in giving full information, and giving it promptly or otherwise, is a circumstance to be taken into account along with the other question in determining the quality of the potatoes. If the defendant received the potatoes, and remained silent as to the frozen ones, that would be a strong circumstance against their pretense that they were bad. If, in giving plaintiffs notice, they failed to give as full information as they should have done, or delayed in giving the information, that would be a circumstance to be taken into account in determining what the fact is as to whether it is a breach of warranty by reason of the potatoes being frozen."

The contention of plaintiffs that because defendant, upon the arrival of the potatoes at Spokane, was, at its own request, permitted to inspect the potatoes before paying for them, there was no implied warranty; that the inspection was a waiver of the warranty; that under the facts of this case the defendant must be held to have accepted the potatoes at Spokane in fulfillment of the plaintiffs' contract; and that the rule of caveat emptor applies,—cannot be sustained. The general rule of law is that, where a buyer of personal property, goods, wares, and merchandise has an opportunity to inspect the same at the time of purchase, caveat emptor applies. "No principle of the common law has been better established, or more often affirmed, both in this country and in England, than that in sales of personal property, in the absence of express warranty, where the buyer has an opportunity to inspect the commodity, and the seller is guilty of no fraud, and is neither the manufacturer nor grower of the article he sells, the maxim of caveat emptor applies." Barnard v. Kellogg, 10 Wall. 388; Bridge Co. v. Hamilton, 110 U. S. 113, 3 Sup. Ct. Rep. 537. But wherever the seller has given an express warranty, or the law implies a warranty from the circumstances, or the buyer can bring fraud home to the party from whom he purchased, the doctrine of

caveat emptor fails of application. Schouler, Pers. Prop. 322.
The contract for the potatoes was made by telegrams. The defendant had no opportunity to inspect them at the time of the purchase. The contract was executory. The secretary of the defendant testified, among other things, in answer to questions, as follows:

"Question. What was the purpose of your sending that telegram asking the right to inspect? Answer. We wished to know whether we were getting what we were buying. Q. Did you send that telegram with a view of rejecting the entire car load if they were not what you ordered? A. No, sir; because we had four or five hundred dollars invested in each car."

There has been some controversy in the courts as to the right of the purchaser to accept the goods and rely upon the warranty, some of the authorities holding that where the sale is executory, and the goods, upon arrival at the place of delivery, are found upon examination to be unsound, the purchaser must immediately return them to the vendor, or give him notice to take them back, and thereby rescind the contract, or he will be presumed to have acquiesced in the quality of the goods. But the great weight of authority, as well as reason, is now, we think, well settled that, in cases of this kind and character, if the goods upon arrival at the place of delivery are found to be unmerchantable in whole or in part, the vendee has the option either to reject them or receive them and rely upon the warranty; and, if there has been no waiver of the right, he may bring an action against the vendor to recover the damages for a breach of the warranty, or set up a counterclaim for such damages in an action brought by the vendor for the purchase price of the goods. 2 Schouler, Pers. Prop. §§ 581–583; 2 Benj. Sales, § 977, note 29 et seq.; Id. §§ 1353, 1354, 1356, note 11; Babcock v. Trice, 18 Ill. 420; Best v. Flint, 58 Vt. 543, 5 Atl. Rep. 192; Polhemus v. Heiman, 45 Cal. 573; Hege v. Newsom, 96 Ind. 431; Lewis v. Rountree, 78 N. C. 323; English v. Commission Co., 48 Fed. Rep. 197, and authorities there cited.

3. This brings us to the question of damages as set forth in the last clause of the instructions of the court, that the jury had the right to add a "loss of profits" which the defendant could have made by a resale of the eggs and potatoes if they had been good. We are of opinion that the court erred in adding this clause to the instructions, that the error was prejudicial to the plaintiffs, and that for this error a new trial should be granted. The general rule of damages for breach of warranty as to quantity or quality applicable to the facts of this case is the difference between the actual value of the goods at the time of the sale and what the value would have been if the goods had conformed to the warranty. The authorities in support of this rule are very numerous, and many of them are cited in 2 Suth. Dam. § 670; 2 Sedg. Dam. (8th Ed.) § 762; 2 Schouler, Pers. Prop. § 585. As the sale was made at Omaha, and the goods were to be delivered at Spokane, the defendant was entitled to recover the difference between the contract price and the value of the goods in the market at Spokane at the

time of the delivery. The object of the law in awarding damages is to make the injured party whole. The damages must be shown with certainty, and not left to speculation or conjecture. The law excludes uncertain and contingent profits. "The measure of damages recoverable for breach of warranty of quality is, in general," as stated in Schouler's Personal Property, supra, "the difference in value between the article actually furnished and that which should have been furnished under the contract at the time and place agreed upon. * * * The rule of damages for breach of warranty is the difference between the sound value of the thing as warranted and its actual value. Such reasonable expenses as the buyer has incurred in consequence of the breach may be added in making up the estimate. * * * The buyer may recover not only for the direct and natural consequence of the seller's failure to perform according to agreement, but for such damages besides as both parties might reasonably be supposed to have foreseen, at the time of the contract, would flow from such breach. * * * The price at which the goods were sold at the place of delivery may be evidence tending to show the amount of damages, but it does not furnish the decisive test." The authorities cited in support of the instructions of the court are cases where the vendor of the goods knows at the time of sale that the purchaser has a contract for a resale at an advanced price, and that the purchase of the goods is made to fill such contract, and the sale is made by the vendor to enable the purchaser to comply with his contract. In such cases it is held that the profits which would accrue to the purchaser upon a resale may fairly be said to have entered into the contemplation of the parties in making the contract. Messmore v. Lead Co., 40 N. Y. 422; Thorne v. McVeagh, 75 Ill. 81; Carpenter v. Bank, 119 Ill. 352, 10 N. E. Rep. 18.

4. The objections urged as to the ruling of the court in admitting certain exhibits in evidence are of such a character as are not liable to arise upon a retrial, and will not, therefore, be considered.

The judgment of the circuit court is reversed, and cause remanded for a new trial.